IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONNIE WIMBUSH #360-137     *
    Plaintiff,

  v.         *   CIVIL ACTION NO. JKB-12-106
            (Consolidated with JKB-12-655)
LAURA BOOTH-MOULDEN[1]    *
VICKY WARNICK
DONNELL HOUSEHOLDER    *
BRUCE LILLER
MS. ROGER         *
DEPARTMENT OF HEALTH AND MENTAL
 HYGIENE        *
DIRECTOR NORTH BRANCH
 CORRECTIONAL INSTITUTION    *
    Defendants

## MEMORANDUM

In these consolidated civil rights cases filed pursuant to 42 U.S.C. § 1983, Ronnie Wimbush, who is incarcerated at the North Branch Correctional Institution (NBCI), seeks money damages and alleges that psychology personnel have failed to provide him adequate treatment and refused to place him in NBCI's "Behavior Management Program" ("BMP"). Counsel for defendants Moulden, Warnick, Householder, and Liller have submitted a dispositive motion (ECF No. 19) which shall be construed as a motion for summary judgment opposed by Wimbush.[2] ECF Nos. 22-24, 27 and 31. The court now rules pursuant to Local Rule 105.6 (D. Md. 2011), no hearing being necessary. For the following reasons, defendants' motion for summary judgment will be granted.

## Background

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of defendants' names and to add Ms. Roger as a party to these proceedings. However, for reasons apparent herein, Wimbush's failure to detail any allegations against this defendant precludes him from entitlement to money damages.

[2] Wimbush's "motion to dismiss defendants' motion for summary judgment" (ECF No. 22) shall be construed as an opposition to defendants' dispositive motion.

Wimbush alleges that shortly after his June 21, 2011, transfer to NBCI, he "placed slips to be seen by psych." ECF No. 1 at 4. According to Wimbush, these requests to be evaluated by the psychiatric staff at NBCI went unanswered until October 25, 2011, and during this time he was deprived of medication he regularly takes to treat his depression. *Id.* at 4-5. As a result of the lack of medication, Wimbush claims he suffered bouts of "anger" and received several infractions for displaying angry behavior. *Id.* Wimbush refused to "lock-down" until he was seen by someone from the psychiatric staff, and was then seen by Laura Booth-Moulden, a mental health counselor, who told him that his written requests to be evaluated must have been "overlook[ed]." *Id.*, 5-6. When Wimbush told Booth-Moulden that he would write a letter to her supervisor to complain about not being evaluated by the psychiatric staff, she stated she would "make sure his letter does not get there." *Id.* at 5-6. Wimbush states that on October 10, 2011, the letter he wrote to the Department of Health and Mental Hygiene regarding his concerns was returned to him without explanation. *Id.*

Wimbush also alleges that on four occasions, he requested admission to NBCI's Behavior Management Program in order to "restore back to health his manners and morals that had gotten out of control from being off his medication for so long and from not being evaluated so he could receive the immediate help he needed." *Id.* at 8. According to Wimbush, these requests were denied and he was told by NBCI staff on November 17, 2011, that "he will not get any treatment for 6 more month[s] until his behavior improve[s]." *Id.* Plaintiff has also attached several exhibits to his complaint to support his claim that he was denied admission to the Behavior Management Program. *Id.* at 12-17. Wimbush maintains that defendants' refusal to evaluate and treat his depression and admit him to the BMP demonstrates deliberate indifference to his medical needs and violates his Eighth Amendment rights. *Id.* at 9-10.

Defendants present a different version of events. Wimbush entered the Division of Correction ("DOC") on December 9, 2009, and was housed at Eastern Correctional Institution ("ECI") in Westover, Maryland,[3] where he was prescribed Prozac for depression. ECF No. 19, Booth-Moulden Declaration. Plaintiff also participated in a behavioral health program known as "Taking a Chance on Change."[4] ECF No. 19, Exhibit 4 to Booth-Moulden Declaration.

Wimbush was transferred to NBCI on June 28, 2011. Transfer screening documents advised staff at NBCI that Wimbush was currently being treated for depression with Prozac, and that he did not have any acute mental health complaints. ECF No. 19, Exhibits 1 and 2 to Booth-Moulden Declaration. Also on the date of his transfer, a nurse at NBCI conducted a review of Wimbush's medical records and noted she had reviewed his records for "psychotropic medications, mental health conditions, [and] suicidal history . . . ." She also noted that he was currently taking Prozac, and had been doing so since at least May 11, 2011. Exhibit 3 to Booth-Moulden Declaration.

On June 30, 2011, Wimbush placed four sick-call requests, stating that he needed treatment for chronic pain in his right leg and ankle, a sinus problem, and a flare of his eczema. *Id.,* Exhibit 5 to Booth-Moulden Declaration. That same day, Wimbush also placed a request with an NBCI social worker to be placed in the Behavior Management Program ("BMP").[5] *Id.,*

---

[3] Originally a medium security prisoner, Wimbush on December 28, 2010, was found guilty of violating several DOC rules and was assigned to ECI's disciplinary segregation unit for 365 days. ECF No. 19, Exhibit 41 to Declaration of Laura Booth-Moulden ("Booth-Moulden Declaration").

[4] The "Taking a Chance on Change" Program is offered to inmates housed in segregation units for no less than 90 days. ECF No. 19, Exhibit 4 to Declaration of J. Gary Sindy ("Sindy Declaration"). The program is offered to give inmates the opportunity to evaluate how their past and current behaviors led to their being housed in a segregation unit, and a chance to have their segregation time reduced by changing that behavior. *Id.*

[5] The Behavior Management Program is an NBCI incentive-based program offered to inmates housed in segregation units. ECF No. 19, Exhibit 5 to Sindy Declaration. The general goal of the program is to aid participants in the development of life skills that will assist them in obtaining less restrictive housing while also reducing violence. *See id.* The program consists of an entry level and five successive levels of cognitive behavioral management

Exhibit 6 to Booth-Moulden Declaration. Wimbush was seen by Dr. Colin Ottey on July 8, 2011. Dr. Ottey reviewed Wimbush's medical history, current medications, and immediate complaints, and created a treatment plan which included management of his chronic pain. Dr. Ottey noted that Wimbush was currently taking Prozac and had been since at least May 11, 2011. *Id.*, Exhibit 7 to Booth-Moulden Declaration.

On July 20, 2011, a nurse from the Behavioral Health Unit conducted a segregation visit with Wimbush, who indicated that he wished to continue his participation in the "Taking a Chance on Change" Program, which he had started at ECI. The nurse acknowledged that she had received his completed work from the program at ECI, agreed to continue his participation in the program at NBCI, and provided him with new lessons to complete. *Id.*, Exhibit 8 to Booth-Moulden Declaration.

On August 5, 2011 the BMP Admissions Committee responded to Wimbush's June 30, 2011, request for admission into the BMP program, informing him that he would not be accepted at that time, but that he could "request placement again in 3 months to allow time for adjustment to NBCI." *Id.*, Exhibit 9 to Booth-Moulden Declaration. On August 25, a nurse from the Behavioral Health Unit conducted another segregation visit with Wimbush and noted that he had completed the first unit of the Taking a Chance on Change Program. *Id.*, Exhibit 10 to Booth-Moulden Declaration.

On August 29, 2011, Wimbush again requested admission into the BMP. *See* ECF Document No. 1 at p.15. On September 11, October 4, and October 5, 2011, he placed sick-call requests to be seen by a doctor from the Psychology Department in order to have his medications reordered, stating that he had "not been evaluated since [his] arrival at NBCI" and that as a

programming aimed at self-improvement. The inmate is given the opportunity to study behavior control methods, and can earn an increased number of privileges upon demonstration of progress at each level. *Id.*

result, he had gone without his medication. *Id.*, Exhibit 11 to Booth-Moulden Declaration. On October 8, 2011, Wimbush was seen by Dr. Vincent Siracusano, to whom he complained that he had been taking medication for depression but that the prescription had "expired months ago." He stated he was feeling depressed and wanted to be placed back on medication. Dr. Siracusano noted that Wimbush's Prozac prescription expired on September 11, 2011, and renewed the prescription. *Id.*, Exhibit 12 to Booth-Moulden Declaration.

On October 17, 2011, the BMP Admissions Committee responded to Wimbush's second request for admission. The committee advised Wimbush he had already been evaluated for admission and been denied same on August 5, 2011. He was also told that his request for admission would be considered again in early November of 2011. *Id.*, Exhibit 13 to Booth-Moulden Declaration.

On October 31, 2011, Wimbush was seen by Vicky Warnick, a Psychology Associate, for a behavioral health assessment. Wimbush reported that although he had some "anger problems," he was not currently experiencing any symptoms of depression and that the Prozac he was taking was effective. In response to Wimbush's request, Warnick agreed to provide him with reading materials on anger management. *Id.*, Exhibit 14 to Booth-Moulden Declaration. At this visit, plaintiff also signed an informed consent for psychological services. *Id.*, Exhibit 15 to Booth-Moulden Declaration.

On November 3, 2011, Wimbush made a third request for admission into the BMP. *Id.*, ECF No. 1 at 17. On November 14, 2011, Wimbush sent a letter to Booth-Moulden complaining about not having received the anger management materials promised by Warnick, and advising that he needed to see someone who "will take in [his] concerns." *Id.*, Exhibit 16 to Booth-Moulden Declaration. On November 15, 2011, Wimbush was seen for his depression by Dr.

Stephen Schellhase. Wimbush reported that he was compliant with his medication schedule and was getting "good results" with Prozac. Dr. Schellhase continued Plaintiff on Prozac. *Id.*, Exhibit 17 to Booth-Moulden Declaration.

The Admissions Committee conducted another review of Wimbush's request for admission into the BMP in November of 2011. Prior to the review, Warnick met with Wimbush to conduct a psychological evaluation. Based on this evaluation, Warnick made an initial recommendation to the Admissions Committee to admit Wimbush into the BMP. *Id.*, Exhibit 18 to Booth-Moulden Declaration. On November 17, 2011, the Committee rejected that recommendation and denied Wimbush's request for admission. In support of this denial, the committee noted that Wimbush had 11 pages of infraction history; he was serving 889 days on segregation for assaultive behavior, threatening language, and misuse of security equipment; and his segregation was to end on May 29, 2013. *Id.*, Exhibits 19 and 40 to Booth-Moulden Declaration. Following this denial for admission into the BMP, Wimbush wrote Donnell Householder, an office secretary at NBCI, alleging that his depression has been left "untreated for six month[s]," and seeking reconsideration of the Admission Committee's denial of his request for admission into the BMP. *Id.*, Exhibit 20 to Booth-Moulden Declaration.

Wimbush was again seen by Warnick on December 9, 2011, for a behavioral health session. Wimbush was upset that he had not yet received requested materials about depression. Warnick reassured him that his depression was being addressed, as he had been seen four times by staff from the Psychology Department in the month of November, and that although his depression is always a concern, he was not currently symptomatic. Wimbush stated that he indeed was "future-oriented, ha[d] a spiritual basis of coping, and use[d] meditation." Warnick

noted that Wimbush left the appointment feeling "very much better." *Id.*, Exhibit 21 to Booth-Moulden Declaration.

On December 12, 2011, Booth-Moulden completed an update of Wimbush's medical chart, noting that in response to his request for materials about depression, Wimbush had been given several chapters from a therapeutic workbook for completion. She noted that the materials focused on "identifying automatic thoughts and changing patterns of limited thinking that contribute to mood disturbances." *Id.*, Exhibit 22 to Booth-Moulden Declaration.

On December 27, 2011, Wimbush met with Registered Nurse Mindy Baker for a behavioral health segregation visit, and indicated that he was having thoughts of hurting others. In response, Baker placed Wimbush on behavioral health segregation monitoring. *Id.*, Exhibit 23 to Booth-Moulden Declaration.

On January 4, 2012, Wimbush placed a sick-call request to have his "psych" medication renewed. On January 5, 2011, he requested to be seen by staff from the Psychology Department. On January 5, 2012, Wimbush was again seen by Baker for a behavioral health segregation visit, and again reported he had thoughts of hurting others. As a result, Baker kept him on behavioral health segregation monitoring. *Id.*, Exhibits 24-26 to Booth-Moulden Declaration.

On January 11, 2012, Wimbush requested to be seen by staff from the Psychology Department. On the same day, Registered Nurse Karen Stratton conducted a behavioral health segregation visit and noted that Wimbush had completed several more units of the Taking a Chance on Change program. *See* Exhibits 27 and 29 to Booth-Moulden Declaration.

On January 12 and 13, 2012, Wimbush was involved in three separate altercations with correctional officers which escalated until those officers used force against Wimbush to gain control of the situation. On January 12, a correctional officer approached Wimbush's cell and

opened the security slot in order to give him his morning medications. After receiving the medications, Wimbush ignored several direct orders to remove his arm and allow the security slot to be closed. He also made a statement indicating that he might have a weapon inside his cell. The officer told Wimbush that his cell would be searched for weapons and that Wimbush must submit to handcuffs. Wimbush refused to be handcuffed, and a Use of Force Team was called in. The team deployed pepper spray through the open security slot and was then able to handcuff Wimbush. Correctional officers found two bowls containing a substance that was consistent in smell and appearance with urine and feces. Wimbush was brought to the medical unit for evaluation and treatment for pepper spray exposure and then returned to his cell. *Id.*, Exhibit 1 to Declaration of J. Gary Sindy ("Sindy Declaration").

On January 13, at approximately 1:00 p.m., a correctional officer looked through the cell door window and saw Wimbush violently kicking his heater. The officer ordered Wimbush to stop, but Wimbush continued to kick the heater and shouted at the officer that he was going to kill himself. Wimbush then picked up a piece of loose mortar from his cell floor, threw it in the direction of the officer, and told the officer that he was going to kill him as well. Wimbush then resumed kicking the heater. Wimbush ignored all orders to stop kicking the heater, and was subjected to a burst of pepper spray through the open security slot. Wimbush was then taken to the medical unit for evaluation and treatment for pepper spray exposure. *Id.*, Exhibit 2 to Sindy Declaration; *see also* Exhibit 29 to Booth-Moulden Declaration. He was also interviewed by Booth-Moulden because of his suicide threats. *Id.*, Exhibit 30 to Booth-Moulden Declaration. Booth-Moulden ordered that Wimbush be placed on a suicide watch. *Id.*

At approximately 9:00 p.m. that evening, correctional officers opened Wimbush's security slot to administer his evening medications, and Wimbush again refused to remove his

arm to allow the security slot to be closed, demanding to speak with a sergeant regarding a previous infraction. The officers agreed to take Wimbush to speak with someone about the matter, and told him to turn around in order to be handcuffed. Wimbush allowed one cuff to be placed on his right wrist, but then refused to allow the other wrist to be cuffed, insisting that a sergeant come to his cell. He then attempted to pull an officer's arm through the security slot, at which point the officer deployed a burst of pepper spray through the open security slot. After he was handcuffed, Wimbush was taken to the medical unit for evaluation and treatment for pepper spray exposure. *Id.*, Exhibit 3 to Sindy Declaration; *see also* Exhibit 31 to Booth-Moulden Declaration. Wimbush returned to his cell and remained on a suicide watch. *Id.*, E.

Booth-Moulden visited Wimbush on January 18, 2012, and noted he seemed much improved with regard to his suicidal thoughts. Wimbush stated he was depressed and Booth-Moulden offered him some cognitive behavioral coping skills. Wimbush indicated that he would like to continue working on those skills and Booth-Moulden indicated that staff from the Psychology Department would continue to work with him in that regard. *Id.*, Exhibit 32 to Booth-Moulden Declaration.

On January 20, 2012, Wimbush had another behavioral health session with Warnick and was given instructions on listing his thoughts and feelings. It was noted that he "seemed invested in the process." *Id.*, Exhibit 33 to Booth-Moulden Declaration.

On February 8, 2012, Stratton conducted a behavioral health segregation visit with Wimbush and noted that he had completed the anger management segment of the "Taking a Chance on Change" program. *Id.*, Exhibit 34 to Booth-Moulden Declaration. On February 11, 2012, Wimbush placed a sick-call request to be seen by staff from the Psychology Department and to have his medications renewed. *Id.*, Exhibit 35 to Booth-Moulden Declaration. On

February 15, 2012, Wimbush was seen by Dr. Schellhase for his depression. He indicated he felt anxious and requested additional reading material about depression. Dr. Schellhase advised Wimbush that he could get information on depression from the behavioral health staff. Dr. Schellhase also noted that Wimbush had been compliant with his medication as prescribed and renewed Wimbush's Prozac prescription. *Id.*, Exhibit 36 to Booth-Moulden Declaration.

On March 7, 2012, Warnick updated Wimbush's medical records, indicating that he had written a letter to the Psychology Department complaining generally of his dissatisfaction with the Department and specifically alleging that his mental health needs were being neglected. Warnick also noted that Wimbush was scheduled for a review by the Psychology Clinical Review Team for further diagnostic evaluation and to determine why he had not responded to the Psychology Department's interventions. *Id.,* Exhibit 37 to Booth-Moulden Declaration.

On March 9, 2012, Wimbush met with the review team. The team addressed Wimbush's claims that his mental health needs were being ignored. Wimbush acknowledged having received the reading materials he requested regarding depression and was told that they would investigate getting him even more material. The review team told Wimbush that he could realistically expect to be seen by the Psychology Department staff every 30-60 days unless there was a crisis, and that he could again request admission into the BMP program in May of 2012. *Id.*, Exhibit 38 to Booth-Moulden Declaration.

Wimbush was again seen by Dr. Schellhase on March 13, 2012, and complained of continued anxiety. He stated that he did much better when he was at ECI and taking Stelazine and Benadryl as well as Prozac for his depression. Dr. Schellhase agreed to restart those medications at the previously effective doses and to increase the dosage of Prozac. *Id.*, Exhibit 39 to Booth-Moulden Declaration.

10

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317(1986). When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial. *See Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249. Further, the court must construe the facts in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *In re Apex Express Corporation*, 190 F.3d 624, 633 (4th Cir. 1999).

A federal court must liberally construe pleadings where, as here, the plaintiff is a self-represented litigant, in order to allow development of potentially meritorious cases. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.

## Analysis

To the extent the complaint names the Department of Health and Mental Hygiene and the Director of NBCI as Defendants, the claim against the Director, as presented, is based solely upon vicarious liability, otherwise known as respondeat superior.  The doctrine of respondeat superior generally is inapplicable to § 1983 suits.  An employer or supervisor is not liable for the acts of employees, in the absence of an official policy or custom that results in illegal action.  *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

Similarly, Plaintiff's complaint versus the Department of Health and Mental Hygiene is subject to dismissal.  Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless the state consents.  *See Penhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984).  While the State of Maryland, which operates the Department of Health and Mental Hygiene, has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.  For this reason, the Department is dismissed from this action.

The remaining defendants raise Wimbush's failure to exhaust his administrative remedies as an affirmative defense in this case.  ECF No. 19, Declaration of Jared Zais ("Zais Declaration") at ¶ 5.  Wimbush does not contradict the Zais declaration.

Under the Prison Litigation Reform Act of 1995 (PLRA), prisoners are required to "... exhaust such administrative remedies as are available prior to filing suit in federal court." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (internal quotation marks omitted) (quoting 42 U.S.C. § 1997e(a)).  The PLRA applies to "all inmate suits about prison life,

whether they involved general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Before bringing suit in federal court, "a prisoner must have utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Exhaustion is mandatory and unexhausted claims may not be brought in court. *See Jones v. Bock*, 549 U.S. 199 (2007).

Wimbush is required under the PLRA to properly exhaust all administrative remedies prior to filing suit and has failed to do so. Unlike the circumstances in *Taylor v. Barnett*, 105 F. Supp. 483, 486 (E.D. Va. 2000), prison officials do not appear to have frustrated Wimbush's attempts at exhaustion; instead, Wimbush through his own inaction failed to initiate administrative remedies. This failure to exhaust provides sufficient basis to dismiss this lawsuit; however, given the question of denial of mental health care, the court shall also address the care provided to Wimbush by NBCI psychology personnel.

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). When prison officials show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id.* at 104. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Prison officials are entitled to rely on medical judgments and expertise of prison

physicians and medical personnel concerning the course of treatment deemed necessary for prisoners. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier*, 896 F.2d at 854–55 (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel).

A defendant must know of and disregard an excessive risk to inmate health or safety. Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *See Miltier*, 896 F.2d at 852.

The Constitution may entitle a prisoner to psychiatric or psychological treatment if a "physician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or denial of care would be substantial." *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). The right is limited to care that can be provided on a reasonable cost and time basis. *Id.* at 48.

It is clear that Wimbush cannot claim that he is not receiving any mental health services; rather, he is not receiving the services he desires. In the absence of any evidence that these services are necessary and/or that the services being provided are not effective, this does not rise to a constitutional level. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Bowring*, 551 F.2d at 48. Even when viewed in the light most favorable to him, Wimbush's allegations, set forth in his complaint and numerous opposition pleadings, fail to show deliberate indifference. A prisoner may disagree with his treatment or the treatment might be negligent, but deliberate

14

indifference demands more. Here, the verified and undisputed records show that Wimbush was seen by medical and mental health care providers and was prescribed medication and other courses of treatment for his mental health concerns. He additionally has been provided reading materials and some program access, although he remains ineligible for the BMP program he seeks. His disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright*, 766 F.2d at 849; *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

Finally, to the extent Wimbush claims that defendants have prevented him from assignment to the BMP or other programs, his claim is unavailing. To show a civil rights violation, Wimbush must that the actions taken to keep him from such programs impacted on the exercise of a constitutionally protected right. Prisoners, however, do not have a constitutionally protected right to access education or rehabilitative programs. *See Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985) (no right to vocational course of rehabilitation); *Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992) (no constitutional right to be placed in prison factory job); *see also Rhodes v. Chapman*, 452 U.S. 337, 348 (1981) (limits on work or education due to overcrowding do not constitute punishment); *Bowring*, 551 F.2d at 48 n.2 (4th Cir. 1977) (rehabilitation is a goal of incarceration but is not constitutionally required).

For these reasons, the court will grant summary judgment in favor of all defendants. A separate order follows.

June 28, 2012
_____
Date

_____
James K. Bredar
United States District Judge

15